

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00087-CV

IN THE INTEREST OF C.L.R., R.S.R., AND C.B.R., CHILDREN

On Appeal from the 364th District Court
Lubbock County, Texas
Trial Court No. 2010-553,459, Honorable Brad Underwood, Presiding

October 21, 2015

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellant, the father of C.L.R., R.S.R. and C.B.R,[1] appeals the trial court's order in a suit to modify the parent-child relationship. He presents two issues. We will affirm the trial court's order.

Background

The father and the mother of the children were married in September 2004. R.S.R. and C.B.R. were born to the couple during the marriage. Also during the marriage, the father adopted the mother's child C.L.R., a child born during her former

---

[1] The father is the biological father of R.S.R. and C.B.R. He is the adoptive father of C.L.R. C.L.R. was born in 2002, R.S.R. in 2006, and C.B.R. in 2009.

relationship. The couple divorced in December 2010 and both the father and the mother married their current spouses in 2013. The mother and her new husband have a child together. In June 2014, the mother's husband was employed as an assistant manager at a LaQuinta hotel in Lubbock, Texas. He later accepted another position as a LaQuinta general manager in Sherman, Texas, approximately 300 miles from Lubbock, for a higher salary. The mother left her job in Lubbock in 2014. At the time of the hearing, she was taking online classes toward her bachelor's degree in special education.

From the time of the divorce until February 2012, the father spent time with all three children as set forth in the divorce decree. In February 2012, C.B.R. was severely injured when C.L.R. fell while holding him. After that incident, the father and C.L.R. had a strained relationship.[2] In December 2012, the father and mother signed an agreement substantially increasing his periods of possession of the children, allowing him to take possession of the children on the first, third and fifth Fridays of each month and return them to school on Monday. During the summer, he was permitted to have the children beginning at 3:00 p.m. on the first, third and fifth Fridays of each month and ending at 9:00 a.m. the following Monday. He also was allowed to have the children overnight on Thursdays during the school term and during the summer.

---

[2] The mother testified, concerning the father, "He was really upset. He told C.L.R. and I both that it was our fault, that if we had been watching [C.B.R.] correctly that it wouldn't have happened, that accidents don't happen whenever you're doing the right thing."

After the incident in February 2012, C.L.R. went to her father's home only once.[3] The mother testified he seemed disinterested in C.L.R., but the father did ask C.L.R. to accompany him on family outings and trips.[4] C.L.R. chose not to do so.

In June 2014, the mother filed a petition to modify the parent-child relationship, pleading that the "circumstances of the children, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of rendition of the order to be modified"[5] and seeking "that the geographical restriction to Lubbock County, contained in the Final Decree be lifted, and that she be appointed as the person who has the right to designate the primary residence of the children without regard to geographic location." The father filed a counter-petition to modify the decree, seeking the right to determine the residence of R.S.R. and C.B.R. but not C.L.R. [6]

The court held the final hearing in October 2014. After hearing the testimony of both parents and a counselor, the trial court modified the father's possession of each of the children. It modified his possession of C.L.R. to access at the home of the mother "by agreement of the parties." It modified the father's possession of R.S.R. and C.B.R.

---

[3] The mother testified that on that visit, C.L.R. went with the other children to visit the father. He "soon after" called the mother and told her he was bringing C.L.R. back. When she arrived, the child was "very upset, crying."

[4] One such trip was a trip to Florida. The mother testified she did not allow any of the children to accompany the father on that trip because it was in October and would require the children to miss four days of school. According to the mother, the father was "mad. He didn't agree with me. He thought that they should be able to go."

[5] Both parties pled there had been a material and substantial change in the circumstances. Thus, the father judicially admitted that essential element of the mother's case for modification. *See In the Interest of A.E.A.,* 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.); *In re L.C.L.,* 396 S.W.3d 712, 718-19 (Tex. App.—Dallas 2013, no pet.) (both cases finding judicial admissions from pleadings in modification proceedings).

[6] In August 2014, the father and his new wife experienced a still-born birth. He told R.S.R. and C.B.R. about the event but did not tell C.L.R.

to that provided by the Standard Possession Order, giving him possession on the first, third and fifth weekends of each month. The court also ordered a month-long period of possession during the summer, as well as other periods of possession. The court appointed the mother as the parent having the right to establish the primary residence of the children "without regard to geographic location." The court also made additional related orders and subsequently entered findings of fact and conclusions of law. After the father's motion for new trial was overruled by operation of law, he timely filed notice appealing the trial court's order.

Analysis

On appeal, the father challenges the trial court's order modifying his possession of the children, appointing the mother as the parent entitled to determine the children's residence and lifting the geographical restriction originally imposed in the divorce decree. He contends the modification is not in the children's best interests and insufficient evidence supports the modification.[7] We disagree.

An appellate court reviews a trial court's order regarding child custody, control, possession, and visitation for an abuse of discretion. *In re L.C.L.,* 396 S.W.3d at 716 (*citing In re H.N.T.,* 367 S.W.3d 901, 903 (Tex. App—Dallas 2012, no pet.) and *Jacobs v. Dobrei,* 991 S.W.2d 462, 463 (Tex. App—Dallas 1999, no pet.)). A trial court abuses its discretion when it acts arbitrarily and unreasonably without reference to guiding principles. *Id. (citing In re H.N.T.,* 367 S.W.3d at 903 and *In re W.C.B,* 337 S.W.3d 510, 513 (Tex. App—Dallas 2011, no pet.)). In family law cases, the abuse of discretion

_____

[7] The mother did not file an appellate brief.

4

standard of review overlaps with traditional standards of review. *L.C.L.,* 396 S.W.3d at 716; *see Crawford v. Hope,* 898 S.W.2d 937, 940 (Tex. App.—Amarillo 1995, writ denied); *In re Ferguson,* 927 S.W.2d 766, 769 (Tex. App.—Texarkana 1996, no writ). As a result, legal and factual insufficiency are not independent grounds of reversible error, but instead are factors relevant to an appellate court's assessment of whether the trial court abused its discretion. *L.C.L.,* 396 S.W.3d at 716; *Crawford,* 898 S.W.2d at 940. To determine whether the trial court abused its discretion, an appellate court considers whether the trial court had sufficient evidence on which to exercise its discretion and erred in its exercise of that discretion. As long as some evidence of a substantive and probative character exists to support the trial court's judgment, an appellate court will not substitute its judgment for that of the trial court. *L.C.L.,* 396 S.W.3d at 716.

A trial court may modify a conservatorship order if the petitioner proves by a preponderance of the evidence that the modification would be in the best interests of the child. TEX. FAM. CODE ANN. § 105.005 (West 2013). The best interest of the child is the primary consideration in determining conservatorship or residency of a minor child. TEX. FAM. CODE ANN. §§ 153.001, 153.002 (West 2014); *In re V.L.K.,* 24 S.W.3d 338, 342 (Tex. 2000); *Zeifman v. Michels,* 212 S.W.3d 582, 589 (Tex. App.—Austin 2006, pet. denied). One attempting to modify an order establishing conservatorship, possession, and access to a child must show that (1) there has been a material and substantial change in the circumstances since the rendition of the existing order or the signing of a mediated or collaborative settlement agreement on which the order is

based, and (2) the modification would be in the best interest of the child. TEX. FAM. CODE ANN. § 156.101(a) (West 2014).

Our inquiry here is whether the record contains some substantive and probative evidence the modification order was in the children's best interests. Trial courts have wide latitude to determine what is in a minor child's best interests. *In the Interest of O.G.,* No. 05-13-1263-CV, 2014 Tex. App. LEXIS 7021, at *10 (Tex. App.—Dallas June 26, 2014, no pet.) (mem. op.) (*citing Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). In a bench trial, the trial judge is in the best position to observe and assess the witnesses' demeanor and credibility. *In re A.L.E.,* 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). We therefore defer to the trial court's resolution of underlying facts and of credibility determinations that may have affected its determination, and will not substitute our judgment for that of the trial court. *Id.*

Both the mother and father testified to the close relationship between the father and his two biological children, R.S.R. and C.B.R. The father frankly acknowledged his strained relationship with C.L.R. after she fell while carrying C.B.R.[8] Nevertheless, the father argues the familial circumstances of all three children are better in Lubbock than in Sherman. The father argues R.S.R. and C.B.R. are close to him, despite the tension with C.L.R., and very involved in his life and with his family. The father contends the children's relationship with his family, particularly the grandparents, would be negatively impacted if they were moved to Sherman.[9] With his testimony, the father introduced

---

[8] The mother testified the father emailed her and "made the comment that he should have never adopted her, that that wasn't his place."

[9] The mother testified that prior to July 2014, C.L.R. had a good relationship with her grandparents. But, after a hearing relating to this matter, that relationship ended. The mother told the

6

many family photographs.  He described outings and trips with the children, pets the children had at his home, and time at his family's farm. He also admitted that C.L.R. was present in only a handful after February 2012.

The father also argued that if the children moved to Sherman, he would no longer be able to see them for his Sunday and Thursday overnight visits. He also told the court, "[t]aking them to school and picking up—them up from school is very important.  It allows me to be a regular parent involved in their life on a continual—in a continual relationship.  I don't know how that would be possible if they move them away."  The mother also acknowledged the change would be significant in its impact on his time with the children.  She also admitted there was a time in August 2014 that she contemplated moving to Sherman while leaving R.S.R. and C.B.R. in the father's care. She said her opinion had changed and told the court she believed his relationship with R.S.R. and C.B.R. had been impacted by his difficulties with C.L.R.  She related an incident in which the father yelled at R.S.R. over the phone and that R.S.R. was "scared. She wanted to leave.  She left to play outside."

The mother also testified she was the person most involved with the children, telling the court she took off work to stay home with C.B.R. after his injury and attended school functions with the children. She told the court the father attended few such functions and events. She also testified that when the father did attend school functions, he exhibited negative behavior, such as telling her to "shut up," calling her names like "slut" and telling her she was "trashy."  He also "flipped [her] off driving down the street"

---

court the father told her that "because of what's going on in court" he was "no longer going to allow his family to have a relationship with C.L.R."

when they passed each other going to a school meeting. The mother testified the three children were close to her current husband and their half-sister. She presented several photographs of the family together. She testified she believed modification was in the best interests of her children "[b]ecause I feel like we should all be together as a family because we—[husband] and I have a child together as well." The counselor also testified she had observed the four children together, that they were close and that "[w]ithout a doubt it would be harmful if they were separated." The trial court could have taken the mother's and the counselor's testimony to be significant evidence supporting its conclusion to modify the order.

The father also argues the evidence concerning the emotional well-being of his children does not show the modification of the order was in the best interests of C.L.R. or his two biological children. The mother testified she took C.L.R. and R.S.R. to counseling for several months in 2012[10] after observing anger management issues, problems among the siblings, and C.L.R.'s continual attempts to "mother" the younger children. Later, in September 2014, the mother took the older children to another counselor, telling her she was concerned about C.L.R.'s emotional health regarding the situation with the father and inquiring into whether moving to another city would exacerbate the problems the children were experiencing. The counselor testified at the hearing she believed such a move would be "neutral" as to C.L.R.

The father notes C.L.R. had emotional problems with her mother and siblings, issues that would not improve with relocation. More importantly, however, the father points to the counselor's statement that resolution to the conflicts will require long-term

---

[10] The mother testified she took C.B.R. "one time."

8

counseling which cannot be efficiently achieved with the children in Sherman and the father in Lubbock. And, the father contends no evidence was presented regarding the possibility of counseling in Sherman.[11] The father also told the court that after being admonished by a judge at a prior hearing and, most significantly, after suffering the loss of his newborn son, he realized his issues with C.L.R. were "just petty" and he "hate[d] the time that we've lost . . .". He told the court he loved C.L.R. and would participate in counseling or other activities to help her.

But the trial court could have considered the mother's testimony and other evidence describing the father's actions toward and lack of communication with C.L.R., and his derogatory comments about the mother, her family, and C.L.R. The counselor testified the father told C.L.R. he "has no intentions of having a relationship" with her. Also, the mother agreed the father did not attempt any reconciliation with C.L.R. And, the mother told the counselor C.L.R. "experiences sadness where her siblings go to—to their father . . .". The counselor also testified to her concern about the father's behavior toward C.L.R. stating, "[t]o reject a nine-year-old little girl and refuse contact with her for two and a half years, my concern would be that when the younger children begin to have their own opinions, rejection could easily happen there. My concern is the anger which the children have reported. My concern is the -- the lack of control there appears to be from the children's statements . . .". The trial court certainly could have taken this

---

[11] The mother testified she believed the children and the father would be able to attend counseling when they visited their father, as long as the father and C.L.R. were able to reconcile prior to the move.

9

evidence into consideration in determining modification of the order was in the children's best interests.[12]

The father also points to evidence showing C.L.R. was doing very well in school in Lubbock, as was R.S.R.  And C.B.R. was doing well in kindergarten. The mother agreed all three children were "very good students."  However, the mother testified it would ease the hardship on her family and they "can provide better for them" if she and the children were able to move to Sherman to be with her husband.  She told the court she had taken the children to Sherman on two occasions.  She also said she and her husband had located a five-bedroom home in a small community near Sherman, had found the local schools to be well-rated, had located libraries, sports fields and a gymnastics facility for C.L.R. and R.S.R., and had spoken with a pediatrician who would treat the children. The counselor testified the children were excited about the move even though they would see their father less.

The father also points to testimony showing the financial circumstances of the mother and her new husband would not be significantly different in Sherman than in Lubbock. The father argues the choice to move to Sherman was not a choice made considering the best interests of the children but rather was in the interests of the mother's husband.  And, he asserts, differences in the cost of living and the additional costs of visitation would offset the husband's higher salary.

---

[12] At the conclusion of the hearing, the trial judge granted the mother's motion to modify, noting he wanted to keep the three children together.  He also specifically noted both the father's "huge anger issue" and his unwillingness to address his relationship with C.L.R.

The trial court's findings of fact state the husband "was offered a job opportunity in Sherman, Texas, and was told by his employer that he either moved to Sherman, or he wouldn't have a job with LaQuinta." The mother testified that her husband "had to take the job in Sherman, because if he didn't, he would not have a job here in Lubbock." She also told the court the new position made her husband eligible for bonuses that had not been available to him in Lubbock. And, the mother told the court "[t]he benefit to the children if they move to Sherman is that I can attend school and I can finish and make more money for them in the long run. It's not just about right now, but the opportunity for the long haul." The mother testified if the court did not lift the geographical restriction, she would remain in Lubbock with the children. The trial court could have concluded from this evidence that granting the mother's requested modification was in the children's best interests.

Having reviewed the record of trial, we find the trial court heard evidence of a substantive and probative character supporting its conclusion it was in the children's best interests that the parents remain joint managing conservators and that the mother be appointed the parent having the right to establish the residence of the children without regard to geographical location.

Conclusion

Having resolved each of the father's issues against him, we affirm the trial court's order modifying the parent-child relationship.

James T. Campbell
Justice

11